No. 17-11289-Q

_____

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

United States of America,
*Plaintiff-Appellee*

vs.

Noor Z. Salman,
*Defendant – Appellant*

_____

On Appeal from the United States District Court
For the Middle District of Florida, Orlando Division
D.C. No.  6:17-cr-00018

_____

## MOTION TO VACATE LOWER COURT
## ORDER DETAINING DEFENDANT NOOR SALMAN

*/s/ Charles D. Swift*
Charles D. Swift, Esq.
Texas Bar No. 24091964
Constitutional Law Center for
        Muslims in America
833 E. Arapaho Rd., Suite 102
Richardson, TX  75081
Phone: (972) 914-2507
Fax:   (972) 692-7454
*Attorney for Appellant*

*/s/ Fritz Scheller*
Fritz Scheller
Florida Bar No. 0183113
Fritz Scheller, P.L.
200 E. Robinson Suite 1150
Orlando, FL 32801
PH: (407) 792-1285
FAX: (407) 513-4146
*Attorney for Appellant*

US v. SALMAN - No. 17-11289-Q

## DEFENSE CERTIFICATE OF INTERESTED
## PERSONS AND CORPORATE DISCLOSURE STATEMENT

The following persons have an interest in the outcome of this case:

1. Amin, Haitham G., Esq.;

2. Bentley, A. Lee, III, former United States Attorney;

3. Byron, Hon. Paul G., United States District Judge;

4. Handberg, Robert Bernard, III, Assistant United States Attorney;

5. Hasib, S. Waqar, Assistant United States Attorney;

6. Irick, Hon. Daniel C., United States Magistrate Judge, former Assistant United States Attorney;

7. Kalar, Steven, Federal Public Defender;

8. Mandolfo, James D., Assistant United States Attorney;

9. Moreno, Linda G., Esq.;

10. Muldrow, W. Stephen, Acting United States Attorney;

11. Reichmuth, John Paul, Federal Public Defender's Office;

12. Rhodes, David P., Assistant United States Attorney, Chief, Appellate Division;

13. Ryu, Hon. Donna M., United States Magistrate Judge;

14. Salman, Noor Zahi, defendant-appellant;

15. Scheller, Fritz J., Esq.;

16. Spaulding, Hon. Karla R., United States Magistrate Judge;

17. Sweeney, Sara C., Assistant United States Attorney;

18. Swift, Charles Davidson, Esq.; and

**C - 1 of 2**

US v. SALMAN - No. 17-11289-Q

19. Victims (Defense has nothing to add to the Victim's List Attachment provided in the United States' CIP, filed on March 28, 2017).

No publicly traded company or corporation has an interest in the outcome of this Appeal.

Respectfully submitted,

*/s/ Charles D. Swift*
Charles D. Swift, Esq.
Constitutional Law Center for
    Muslims in America
Texas Bar No. 24091964
833 E. Arapaho Rd., Suite 102
Richardson, TX  75081
Phone: (972) 914-2507
Fax:   (972) 692-7454
*Attorney for Appellant*

*/s/ Fritz Scheller*
Fritz Scheller
Florida Bar No. 0183113
Fritz Scheller, P.L.
200 E. Robinson Suite 1150
Orlando, FL 32801
PH: (407) 792-1285
FAX: (407) 513-4146
*Attorney for Appellant*

## MOTION TO VACATE

NOOR SALMAN moves this Honorable Court to Vacate the District

Court's Order revoking her bond pursuant to 18 U.S.C. § 3142, 18 U.S.C. § 3145

and Fed. R. App. P. 9.

## PROCEDURAL HISTORY

Salman was arrested in the Northern District of California on January 12,

2017, pursuant to an indictment charging her with aiding and abetting her husband,

Omar Mateen, with material support of terrorism, in violation of 18 U.S.C. §§

2339B(a)(1-2), involving the loss of life, and obstruction of justice, in violation of

18 U.S.C. §1512(b)(3). DE1.[1]

On February 1, 2017, the Northern District of California held Salman's

detention hearing. Magistrate Judge Ryu continued the hearing until March 1,

2017, to conduct a psychiatric evaluation. Upon conclusion of that hearing, Judge

Ryu ordered Salman's release under strict conditions. Pursuant to 18 U.S.C. §

3145(a)(1), the Government sought review with the district court in the Middle

District of Florida. DE15. The district court revoked Judge Ryu's release order.

DE24.

---

[1] While the abbreviation "DE" refer to the docket entries in the instant case, the abbreviation "DOC" corresponds to the docket entries in *United States v. Salman,* Case No. 4:17-mj-70058*,* (N.D. Cal. 2017)*.*

1

## STATEMENT OF THE FACTS

Salman's detention hearing was held on February 1, 2017.[2] The Government proffered Salman's alleged admissions made at the end of a 16-hour FBI interrogation that took place immediately after the attack, during which Salman did not have legal counsel.[3] App2[4]. Regarding her prior knowledge of the attack, the Government proffered that Salman admitted she was present when Mateen visited potential locations for his attack and heard him making statements expressing "How bad would it be if a club got attacked?" and "What would make people more upset an attack on downtown Disney or a club?" App2:10-11; DE15:11-12. The Government proffered that Salman admitted to witnessing Mateen watch violent religious extremist videos; knowledge of his purchase of an A-15 rifle and ammunition; and described him as being "pumped up," stating "This is the one day," and carrying a backpack containing ammunition when leaving their home prior to the attack. App2:6-9,12; DE15:11-12. The Government proffered that Salman admitted knowledge that Mateen engaged in exorbitant spending days before the attack.  App2:11-12; DE15:14. Finally, the government proffered

---

[2] Prior to the hearing, Salman filed a Motion with Supporting Declarations for Conditional Release. DOC16, Appendix 1 to this Motion.

[3] On June 12, 2016, Mateen used a semi-automatic weapon at the Pulse Night Club to kill forty-nine individuals and injure fifty-three others.

[4] App2 corresponds to Appendix 2, 2/2/2017 Transcript.  App3 corresponds to Appendix 3, 3/1/2017 Transcript.

Salman admitted knowledge of the attack towards the conclusion of her

interrogation. App2:7-9; DE15:11-12.

To support its aiding and abetting allegations, the Government proffered that

Salman and Mateen both told his family a fictitious excuse for his failure to attend

Ramadan services and dinner the night before the attack, to prevent his family's

discovery of his intentions. App2:19-20; DE15:15-16. The Government stated that

Salman formulated and directed Mateen to use this cover story. *Id.*

The defense proffered that Salman's actions rebutted any prior knowledge of

the attack. DOC16. The defense proffered that after Mateen left their home,

Salman informed her family that she, Mateen, and her son, would visit them soon.

App2:24. Salman then took her son out for dinner, and bought a shirt and Father's

Day card for Mateen. *Id.* Furthermore, texts between during the attack rebutted her

knowledge.

Regarding Salman's knowledge of the purchase of the rifle and ammunition,

the defense proffered that Mateen was a security guard, authorized to carry

weapons. *Id.* at 4. Concerning the "cased locations," Salman did not have a driver's

license at the time, was merely a passenger, and had no say in the choice of

destinations. *Id.* at 11.  Regarding witnessing Mateen watching violent videos and

hearing his terrorist threats, the defense asserted the evidence was insignificant

since Salman was aware that the FBI had questioned and cleared Mateen for

making similar threats. *Id.* at 4. Regarding Mateen's spending in the days before the attack, when Salman questioned the source of the money, Mateen displayed a letter from the Criminal Justice Standards and Training Commission confirming his eligibility for a law enforcement program, and told her things would be different. *Id.* at 4-5.

Concerning Salman's personal characteristics, she is a natural born U.S. citizen with close ties to her community in Rodeo, California; the mother of a four-year-old; has worked as a teacher's aide and cashier; and had no criminal or substance-abuse history. *Id.* at 2-3. Regarding her mental capabilities, Salman struggled with learning disabilities in high school and was enrolled in special education classes.[5] *Id.*; *see also* DOC16:2.

Because of the charge, the defense proffered concerning Salman's non-religious and non-political beliefs, and the marital domestic violence she experienced.[6] DOC16:2-4. Concerning the Government's contention that Salman

---

[5] The defense submitted declarations describing Salman as "simple," "obedient," "childlike," along with a high school teacher's declaration confirming she was a special education student.

[6] Although raised Muslim, Salman did not grow up with strong religious convictions. She did not cover, study Islam, attend services, pray regularly, fast, or observe Ramadan. She did not express any interest in political or religious conflicts. The defense also proffered that Mateen abused Salman. The defense submitted a declaration by Dr. Jacqueline Campbell, an expert with thirty-five years' experience conducting research on intimate partner violence. Under the direction of Dr. Campbell, Salman completed a Danger Assessment, where she scored in the Extreme Danger range, the highest level of danger from an abusive

posed a risk of flight due to the charge's severity, the defense proffered that

Salman and her family voluntarily cooperated with the FBI for eight-months prior

to her arrest.[7] *Id.* at 6-7; *see also* App2:28.

> In response, Judge Ryu questioned the Government:

> The Court: What is the government concerned that [Salman] might
> do? What is the actual danger?

> Ms. Sweeney: An act of violence against the community or anything
> that would pose a threat the community.

> The Court: Is there any evidence the government has that [Salman]
> herself has pledged allegiance to the Islamic State or that there's
> something more specific about the situation that poses more specific
> danger?

> Ms. Sweeney: No, Your Honor. Nothing like that.

> The Court: Is there anything specific that you have on that point other
> than that she is a dangerous person for the reasons stated?

> Ms. Sweeney: No, Your Honor.

App2:16-17.

> Judge Ryu ordered a psychiatric evaluation of Salman, and continued the

detention hearing pending its completion. App2:33, 36-37. The psychiatric

evaluation concluded that Salman suffers from post-traumatic stress disorder

---

intimate partner. Salman scored within a range where 98% of the women were
killed, or almost killed, by an intimate partner.

[7] The declarations of Salman's uncle and aunt established their constant
communication with the FBI regarding Salman's whereabouts and cooperation
with FBI surveillance.

("PTSD") and recommended medication and treatment. App3:4, 40. Although the evaluation found some evidence Salman may have overstated her symptoms, it did not conclude she was malingering because of evidence that she possessed below average intelligence, which provided an alternative explanation of her answers. DE24:12. Based on the psychiatric evaluation, Pretrial Services amended its initial report to recommend release on bond, subject to stringent conditions and participation in treatment.[8] App3:29, 34.

On March 1, 2017, Judge Ryu resumed the detention hearing to question Salman's proposed custodians and sureties regarding their comprehension of their duties and for counsel to continue arguments based on the psychiatric evaluation findings. App3. During questioning, Salman's mother and uncle indicated that, in addition to their residence in California that they were pledging as security for the bond, they each held assets in the West Bank. *Id.* at 16-19. Upon completion of the evidence and argument, Judge Ryu found, under 18 U.S.C. §3142, that Salman had rebutted the statutory presumption and based on all the evidence, Pretrial Services' recommended conditions were sufficient to reasonably assure Salman's appearance and the safety of the community. *Id.* at 33-53.

---

[8] The recommended conditions of release included: 1) a $500,000 secured bond; 2) restricted travel; 3) mental health counseling; 4) GPS location monitoring; and 5) home detention, among other conditions.

Concerning the § 3142(g) factors, Judge Ryu found the nature and circumstances of the offenses favored the government since the charges were very serious. *Id.* at 34-36. Regarding the weight of the evidence, Judge Ryu noted this factor was the least important. *Id.* at 36. Nevertheless, this favored Salman because the strength of the evidence was "debatable." *Id.* at 37. Supporting this conclusion, Judge Ryu conducted a detailed analysis of the Government and defense evidence. *Id.* at 37-39. Based on the nature of Salman's 16-hour detention and the fact that her alleged admissions were provided at its end, the reliability of these admissions were questionable. This lack of reliability was further underscored by the evidence demonstrating Salman's impaired ability to engage in abstract thinking, and domestic violence history. *Id.* Judge Ryu further found the uncontradicted evidence concerning Salman's actions immediately preceding the attack made the weight of the evidence "hotly debated." *Id.*

On the nature and characteristics of the defendant, Judge Ryu found Salman had 1) strong family support; 2) no prior criminal history; 3) financial support during her current unemployment, 4) a learning disability including struggles with abstract thinking; 5) PTSD, per the psychiatric evaluation; and 6) both Salman and her family voluntarily reported her whereabouts to law enforcement and cooperated with them prior to her indictment. Finally, the sureties' properties in the

7

West Bank did not "necessarily create a specific risk of flight that cannot be managed through strict conditions." *Id.* at 39-41.

As to the risk of danger based on Salman's release, the Government failed to identify any concrete danger posed by Salman. Instead, the government conceded that Salman had no connection to the Islamic State and had not exhibited any extremist views. Despite the Government's contention regarding the allegations, there is nothing in the record suggesting that Salman is violent or dangerous. Rather, Salman filed declarations from two longtime friends, a former teacher, and cousin, who described Salman as peaceful and nonviolent. *Id.* at 41-52.

After the government appealed Salman's release, the parties agreed to proceed on the existing record. DE24:18. After reviewing briefs and the existing record, the district court revoked the Order of Release and ordered Salman's detention. DE24.

In revoking the release order, Judge Byron focused primarily on the weight of the evidence as it related to the statutory rebuttable presumption against release. *Id.* at 18, 21, 23-28. Contrary to finding the evidence hotly debated, Judge Byron concluded the evidence against Salman was "substantial and credible," and she had not rebutted the statutory presumption against release. *Id.* at 23.

In reaching this conclusion, Judge Byron relied on the Government's proffer that Salman admitted during her interrogation she: 1) observed her husband

watching ISIL recruitment videos; 2) traveled with her husband to three locations when he was scouting possible target locations for an attack and hearing statements regarding possible attacks; 3) witnessed Mateen's exorbitant spending in the days prior to the attack; 4) observed Mateen, on the day of the attack, leaving their home with a firearm and ammunition while stating "Today is the one day."; and 5) admitted at the interrogation's conclusion to prior knowledge of the attack and fabricating a cover story. *Id.* at 18, 19-24.

Judge Byron acknowledged Salman called her family to tell them the couple would visit, and purchased a Father's Day card and gift immediately prior to the attack, which conflict with prior knowledge of an imminent attack. *Id.* at 22. Judge Byron theorized that based on Salman's admission, she had formulated a cover story that a reasonable jury could see Salman's actions as part of a constructed cover story. *Id.*at 22-23. Judge Byron believed a jury could find the text messages exchanged between the couple, during the attack, as evidence of prior knowledge. *Id.*

Judge Byron concluded Salman's admissions to the FBI constituted substantial and credible evidence that she aided and abetted Mateen in the attempted provision and provision of a material support of a foreign terrorist organization. *Id.* at 23. Furthermore, Judge Byron was unpersuaded by declarations from Salman's family and friends describing her as peaceful. *Id.* Therefore, Judge

9

Byron concluded that she failed to adequately rebut the "statutory presumption."
*Id.*

Judge Byron asserted that even if Salman had rebutted the statutory
evidence, he still concluded that "no condition or combination of conditions may
be fashioned that would assure the safety of the community." *Id.* Judge Byron
found Judge Ryu misapplied the meaning of risk of danger by asking the
Government to identify a specific future threat. *Id.* at 24. Although the Government
admitted there was no evidence that Salman supported or harbored ties to any
terrorist organization, Judge Byron found this admission irrelevant "because it was
not an element of the crime." *Id.* at 24-25.

Judge Byron found Judge Ryu failed to give sufficient credence to Salman's
admissions. *Id.* at 23. Judge Byron dieregarded Judge Ryu's concerns about
reliability of Salman's alleged admissions. *Id.* at 25. Judge Byron concluded that:
1) the psychiatric report did not definitively show mental disability or opine on its
potential impact on her interrogation; 2) a high school transcript did not show
Salman's special education status; and 3) Salman had not contested her ability to
stand trial. *Id.* at 11 n.7, 25-26.

With regard to flight, Judge Byron reiterated there was a statutory
presumption that no such conditions or combinations could be fashioned to ensure
her presence. *Id.* at 27-28. Judge Byron limited his consideration to: 1) Salman's

10

sureties' holding property in the West Bank; 2) the record was devoid of information on whether extradition would be honored from the West Bank; 3) Salman's indictment of obstruction of justice; and 4) the severity of the sentence Salman faces if convicted. *Id.* While noting Salman's constant communication with the FBI prior to indictment, Judge Byron discounted this mitigating fact since it occurred after she was suspected of the charged crimes. *Id.*

Following Judge Byron's revocation of the release order, the Government filed a notice that Salman had not made an admission that she crafted a cover story. DE26. Judge Byron stated the correction was immaterial to his decision. DE27.

## STANDARD OF REVIEW

In reviewing a pretrial detention order under the Bail Reform Act, this Court reviews the district court's factual findings for clear error and the application of law to those facts *de novo. United States v. Hurtado,* 779 F.2d 1467, 1471–72 (11th Cir. 1985). Issues relating to Defendant's individual characteristics and the threat posed by her release are factual questions reviewed only for clear error. *Id.* at 1472.

## ARGUMENT

**I.    The district court erroneously conflated the burdens of production and persuasion and applied the wrong standard of review.**

The Bail Reform Act requires the Government to demonstrate either by clear and convincing evidence that no release conditions will reasonably assure the safety of any other person and the community or by a preponderance of the

11

evidence that detention is necessary to reasonably assure the appearance of the defendant. 18 U.S.C. § 3142(f); *United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007).

In cases where "there is probable cause to believe that the defendant has committed an offense identified as a '[f]ederal crime of terrorism' under 18 U.S.C. §2332b(g)(5)(B)…, there is a rebuttable presumption that 'no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community.'" 18 U.S.C. § 3142(e); *United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008).

Once the presumption has been raised, "the defendant carries the burden of production to come forward with evidence to rebut the presumption." *United States v. Quartermaine*, 913 F.2d 910, 916 (11th Cir. 1990). "The defendant's obligation to come forward with evidence does not shift to the defendant the government's burden of persuasion." *Id*.

The §3142(g) factors are: 1) nature and circumstances of the offense charged, 2) the weight of the evidence against the person, 3) the history and characteristics of the person, and 4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. 18 U.S.C. § 3142(g).

The district court made two legal errors when applying the rebuttable presumption. First, Defendant's burden of production to rebut the presumption merely requires the defendant produce "some evidence." *Hir*, 517 F.3d at 1086; *United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1986) ("The burden of production is not a heavy one to meet"); *United States v. Cook*, 880 F.2d 1158, 1162 (10th Cir. 1989) (same); *United States v. Chagra*, 850 F. Supp. 354, 357 (W.D. Pa. 1994) ("The defendant's burden of production is relatively light and has been construed as easy to meet.").

Second, in determining whether Defendant has met her burden, the court must consider all evidence produced, and is not limited to the weight of the evidence factor.

### A.   *The district court improperly found Salman had not met the burden of production under §3142(e).*

A defendant's burden of production to rebut the presumption is light. In her detention hearing, Salman met her limited burden by submitting substantial evidence regarding the weight of the evidence, her personal characteristics, and her lack of dangerousness to the community. The presumption merely became "an evidentiary finding militating against release, to be weighed along with other evidence relative to factors listed in section 3142(g)." *Quartermaine,* 913 F.2d at 916. Nevertheless, because Judge Byron concluded Salman had not carried her

13

burden of production, he ignored a consideration of all §3142(g) factors by holding there were no conditions under which she could be released.

B.     *The district court improperly failed to consider all evidence provided by Salman in determining that she rebutted the presumption.*

Judge Byron's failure to apply the "some evidence" standard to the rebuttable presumption was compounded by his unwavering focus on the weight of the evidence. Judge Byron ignored the lower court's correct conclusion that "weight of the evidence" is the "least important" factor under § 3142(g). *United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991) ("Of these factors, the weight of the evidence is the least important, and the statute neither requires nor permits a pretrial determination of guilt."). This, however, is only true if "the weight of the evidence is used to buttress a decision to detain the defendant. **If the evidence against a defendant is weak, that becomes an important factor favoring release**. The determination of pretrial release under § 3142 neither requires or permits a pretrial determination of guilt." *United States v. Chen*, 820 F. Supp. 1205, 1208 (N.D. Cal. 1992) (emphasis added); see also *United States v. Calabrese*, 436 F. Supp. 2d 925, 927 n. 3 (N.D. Ill. 2006) (same).

Additionally, Judge Byron's reliance on the weight of the evidence was compounded by use of the wrong standard in evaluating the evidence. Judge Byron repeatedly discounted Salman's proffered evidence because he theorized that "a reasonable jury" or "a jury" could construe the evidence against her. DE24:22-23,

14

25. Judge Byron's approach turned the weight of the evidence factor into a mini-trial, resolving all doubts flowing from the evidence against Salman. *See, e.g., United States v. Motamedi*, 767 F.2d 1403, 1405 (9th Cir. 1985) (citing *Herzog v. United States*, 75 S. Ct. 349, 351 (1955)) ("[d]oubts regarding the propriety of release should be resolved in favor of the defendant."). With his evidentiary postulations, Judge Byron placed an improperly heavy burden of persuasion on Salman, rather than the Government.

Although Judge Byron declined to address the Government's burden of persuasion, the rebuttable presumption cannot shift the burden of persuasion on any §3142 factor to the defendant. *See Hurtado*, 779 F.2d at 1478. Judge Byron's alternative rationales to discount Salman's evidence not only shifted burden of persuasion to her, but also essentially required her to provide evidence that would meet the standard for a judgment of acquittal.

Finally, Judge Byron's factual findings regarding the weight of the evidence contained a clearly erroneous conclusion. In discussing the final text exchanged between Salman and Mateen during the attack, Judge Byron wrote:

> Mateen [asked], "Do you see what's happening?" to which Defendant Salman replied "No." . . . [A] jury may view this as the Defendant suggests; however, a jury may question why the response was not "What are you talking about?" as opposed to merely "No." One with foreknowledge of the impending attack need not inquire of the meaning of Mateen's reply, or so one could argue.

DE 24:23.

15

In fact, Salman had proffered—and the Government did not contest—that Salman responded "No?", not "No.", to Mateen's question. The question mark implies that Ms. Salman *was* asking "What are you talking about?" This distinction is not without a difference, especially in light of Judge Byron's inference from this exchange.

In his opinion, Judge Byron repeatedly relied on Salman's purported admission of crafting a cover story to discount her evidence. DE24:10, 21, 22. Essential to Judge Byron's discounting of Salman's proffered evidence of the purchase of a Father's Day card and gift on the night of the attack, was her "conscious steps to fabricate plausible deniability following the completion of the attack." *Id.* In support of his theory, Judge Byron asserted that "[d]efendant's admission to having created a cover story lends credibility to the latter construction of these events." *Id.*

Judge Byron's reliance on the "cover story" was terribly misplaced since the Government subsequently conceded that "[Salman] did not admit to the FBI that she crafted a cover story for her husband." DE26. Because Judge Byron based his negative evidentiary interpretation on a nonexistent fact, he should have reconsidered his conclusions the weight of Salman's proffered evidence.

16

Judge Byron's consideration and application of the rebuttable presumption in revoking Salman's order of release constitutes legal and factual error, mandating reversal.

## II.    The district court improperly found no condition or combination of conditions could assure the safety of the community.

Judge Byron's finding that even in the absence of the rebuttable presumption, there were no conditions permitting Salman's release, was likewise erroneous.  Judge Byron's analysis of Salman's dangerousness to the community is based on his tenet that "no condition or combination of conditions may be fashioned which would assure the safety of the community." DE24:23. The correct standard is whether no release conditions will "reasonably assure" the community's safety. *United States v. Salerno*, 481 U.S. 739, 741 (1987); *United States v. Fortna,* 769 F.2d 243, 250 (5th Cir. 1985)("the standard is *reasonably assure* appearance, not "guarantee" appearance and that detention can be ordered on this ground only if "no condition or combination of conditions will reasonably assure the appearance"); *United States v. Tortora*, 922 F.2d 880, 884 (1st Cir. 1990) ("Undoubtedly, the safety of the community can be reasonably assured without being absolutely guaranteed"). A requirement that release conditions absolutely assure community safety "would fly in the teeth of Congress's clear intent that only a limited number of defendants be subject to pretrial detention." *Tortora*, 922 F.2d at 884.

By focusing on the nature of the crime and weight of the evidence, Judge

Byron did not discharge his duty to consider all §3142(g) factors. *United States v.*

*Nwokoro*, 651 F.3d 108 (D.C. Cir. 2011).

Regarding a defendant's history and characteristics, §3142(g) states a court

must consider:

> the person's character, physical and mental condition, family ties,
> employment, financial resources, length of residence in the community,
> community ties, past conduct, history relating to drug or alcohol abuse,
> criminal history, and record concerning appearance at court
> proceedings, and

> whether, at the time of the current offense or arrest, the person was on
> probation, on parole, or on other release pending trial, sentencing,
> appeal, or completion of sentence for an offense under Federal, State,
> or local law; and

18 U.S.C. §3142(g).

In declining to fully address this factor, Judge Byron ignored 1) Ms.

Salman's long-standing and significant ties to the community including her young

child, 2) her significant family support; 3) her lack of a criminal history and

substance abuse history; 4) the absence of any history of non-appearance; 5)

Salman's history of nonviolence; and 6) her mental health limitations. Section

3142(g) requires a consideration of these factors as they all significantly mitigated

her danger to the community, as well as her risk of flight.

In addition to ignoring a complete analysis of all §3142 factors, Judge Byron

compounded his error by discounting the Government's concession that Salman

has no allegiance to a terrorist organization and no radical views, noting that "[i]t is not an element of either crime charged in the Indictment that Defendant Salman share her husband's extremist views." DE24:24.

Judge Byron's reasoning is fundamentally flawed since the question before him was whether Salman posed a current danger to others or community, not whether proof of dangerousness (or the lack thereof) was an element of the crime to be considered. Courts properly consider a defendant's allegiance to terrorist groups in determining future dangerousness.

In *Al-Arian*, four defendants were accused of serious terrorism offenses. *United States v. Al-Arian*, 280 F. Supp. 2d 1345, 1347 (M.D. Fla. Apr. 10, 2003). The court detained two defendants who privately "vowed their allegiance to [a terrorist group]'s cause and its brutal path." *Id*. at 1356. But the court released two other defendants because "the evidence of their strong commitment and participation in [the terrorist group's] affairs [was] not as apparent." *Id*. at 1357. If dangerousness was determined solely based on evidence concerning an element of charged offense, he would necessarily find dangerousness since such a consideration excludes evidence of the defendant's commitment to further actions.

After dismissing Salman's lack of adherence to violence, Judge Byron focused again on Salman's alleged admissions. He criticized Judge Ryu's concerns about reliability. Judge Byron erred in finding that Judge Ryu improperly

considered factors outside the Government's proffer to weigh their admissibility.

Judge Ryu's considerations of Salman's mental capacities is validated by research

finding "persons with developmental disabilities [are] . . . particularly vulnerable to

falsely confessing when police apply psychological interrogation techniques to

them." Steven A. Drizin, *The Problem of False Confessions in the Post-DNA*

*World*, 82 N.C.L. REV. 891, 1003-04 (2004). Judge Ryu's concern regarding the

admissions being made near the end of the 16-hour interrogation is vindicated by

the Supreme Court's holding that "[t]he pressure of custodial interrogation is so

immense that it can induce a frighteningly high percentage of people to confess to

crimes they never committed." *J. D. B. v. North Carolina*, 564 U.S. 261, 269

(2011). Judge Byron's misapplication of the impact of Salman's vulnerabilities on

her alleged admissions is underscored by his assertion that she never raised an

issue of competency. A defendant's competency to proceed under 18 U.S.C. §

4241 is a different question than whether her statements are knowing and

voluntary.

Judge Byron also improperly disregarded evidence of Salman's mental

capabilities in focusing on the imprecise nature of the mental health exam. Judge

Byron highlighted the examiner's notation of the possibility "[d]efendant Salman

may have consciously distorted her test responses to create a particular impression,

or she may be generally unsophisticated." DE24:12.  Although required to resolve

this ambiguity in Salman's favor, Judge Byron assumed Salman had distorted her results. *Id.* at 26. Judge Byron expressed skepticism that Salman was a special education student, despite a teacher's declaration to this fact. *See id.* at 11 n.7. Again, when confronted with an evidentiary doubt, Judge Byron improperly resolved it against Salman.

## III.    The district court improperly found that no condition or combination of conditions could assure the defendant's appearance.

In determining that Salman had not rebutted the presumption concerning flight risk, Judge Byron erred in only relying on the severity of a potential sentence and her sureties' ownership of Middle East property.

More than evidence of the commission of a serious crime and a potentially long sentence is required to support a finding of serious risk of flight. *See United States v. Friedman*, 837 F.2d 48, 49 (2d Cir. 1988); *United States v. Giordana*, 370 F.Supp.2d 1256 (S.D. Fla 2005) (serious charges are not enough by themselves to justify detention on flight risk).

Relevant factors courts consider include the use of aliases, unstable residential ties to a community, efforts to avoid arrest, or hidden assets. *Friedman*, 837 F.2d at 49. Evidence of a serious intent to flee the country in response to an indictment also justifies detention. *Giordana*, 370 F.Supp.2d at 1264.

Salman had no aliases or hidden assets and did not have access to foreign bank accounts. She did not have unstable community ties or demonstrate efforts to

avoid arrest. Although aware of the pending charges, she remained in the United States during the eight-month time-period between the incident and her arrest. Judge Byron failed to consider any of these factors.

Instead of attempting to flee when faced with prospective charges, Salman voluntarily cooperated and consistently communicated with the FBI for an eight-month period. Judge Byron discounted Salman's cooperation and communications, opining "these communications occurred while the Defendant was already a suspect in the crimes with which she is now charged." DE24:28. This reasoning is without merit. Indeed, Salman's cooperation instead favors her because the determination of risk of flight is based on a defendant's conduct when charged or suspected of a crime, not before. *See United States v. Sanchez*, 2011 WL 744666 (C.D. Cal. 2011).

Salman not only provided evidence rebutting the presumption, she provided evidence sufficient to reasonably guarantee her presence at trial even in the context of a terrorism prosecution. *Al-Arian*, 280 F. Supp. 2d at 1359 (releasing terrorism defendants who had "strong ties keeping them here . . . and impressive support from family, and friends willing to act as personal sureties.").

Finally, the fact that her sureties have properties in the West Bank does not equate to a serious risk of flight under the conditions set by the Magistrate Judge.

In *Al-Arian*, the released defendants had family living in the Middle East. *Al-Arian*, 280 F. Supp. 2d at 1357.

## PRAYER FOR RELIEF

Therefore, Defendant Noor Salman respectfully requests that this Court reverse the district court's opinion and order her pre-trial release under the conditions initially imposed by Magistrate Judge Ryu.

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This document complies with the word limit of Fed. R. App. P. 5(c)(1) and

27(d)(2)(A) because, excluding the parts of the document exempted by Fed. R.

App. P. 32(f) this document contains 5,039 words.

2.      This document complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this

document has been prepared in a proportionally spaced typeface using Microsoft

Word 2013 in 14 point font, Times New Roman.


*/s/ Charles D. Swift*
Charles D. Swift, Esq.
Attorney for Noor Z. Salman

Dated: March 29, 2017

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the Motion for Appeal of Revocation of Release was sent by CM/ECF delivery on March 29, 2017, to, on all counsel or parties of record on the service list.

<u>/s/ Charles D. Swift</u>
Charles D. Swift, Esq.
Constitutional Law Center for
    Muslims in America
833 E. Arapaho Rd., Suite 102
Richardson, TX  75081
Phone: (972) 914-2507
Fax:   (972) 692-7454
cswift@clcma.org