**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

UNITED STATES OF AMERICA

v.                                                  Case No. 6:17-cr-18-Orl-40KRS

NOOR ZAHI SALMAN

_____

## ORDER

This cause is before the Court on the following:

1.  The Government's Motion for Revocation of Release Order (Doc. 15), filed
    March 2, 2017; and

2.  Defendant's Response to the Government's Motion for Revocation of
    Release Order (Doc. 22), filed March 8, 2017.

Upon consideration, the Court finds that the Government's motion is due to be
granted.

## I.     BACKGROUND

On January 12, 2017, a grand jury sitting in Orlando, Florida, returned a two-count
Indictment against Defendant Noor Salman, charging her with aiding and abetting the
attempted provision and provision of material support to a foreign terrorist organization,
in violation of 18 U.S.C. §§ 2339B(a)(1)–(2), and obstruction of justice, in violation of
18 U.S.C. § 1512(b)(3). (Doc. 1). The Indictment alleges that Defendant Salman aided
and abetted her husband, Omar Mateen, in his attempt to provide material support or
resources to the Islamic State of Iraq and the Levant (hereinafter referred to as "ISIL" or
the "Islamic State"), culminating in the mass murder of forty-nine civilians and the injury
of fifty-three civilians at the Pulse nightclub in Orlando, Florida, on June 12, 2016. (*Id.*).

Defendant Salman was arrested in the Northern District of California and appeared before Magistrate Judge Donna M. Ryu, sitting in the Oakland Division, on January 17, and 18, 2017. (Doc. 15, p. 2). The detention hearing was held on February 1, 2017, and the parties proceeded by attorney proffer, which is the practice in the Northern District of California, Oakland Division. (*Id.*). Magistrate Judge Ryu ordered a psychological evaluation of the Defendant, and the final detention hearing was held on March 1, 2017. (*Id.*).

At the conclusion of the detention hearing, Magistrate Judge Ryu ordered the Defendant released on certain conditions, including GPS monitoring, home incarceration, and a $500,000 bond secured by certain residential property. (*Id.* at pp. 2, 4). The Government moved Magistrate Judge Ryu to stay the order granting pretrial release in order to seek review of that order in this Court, as permitted by 18 U.S.C. § 3145(a)(1). Magistrate Judge Ryu stayed the order setting conditions of pretrial release to allow the Government to seek review of the order before this Court. (*Id.* at p. 3). On March 3, 2017, this Court stayed the Magistrate Judge's order setting conditions of pretrial release and established a briefing schedule to resolve the Government's Motion for an Order Revoking Defendant's Release. (Doc. 16).

## II.      STANDARD OF REVIEW

Upon motion by the Government, a district court is permitted to review a magistrate judge's release order. 18 U.S.C. § 3145(a)(1). However,

> where an original magistrate's release order is subsequently modified or set aside in accordance with the terms of the governing bail statues, the findings made and conclusions reached by the first magistrate to consider release do not have to be found to be clearly erroneous before any modification to the magistrate's order can be made. Rather the reviewing

> court . . . may conduct a *de novo* review of the same facts and
> considerations that impelled the original magistrate's order.

*United States v. Medina*, 775 F.2d 1398, 1402 (11th Cir. 1985) (per curiam). In doing so, the district court is required to independently consider all of the facts properly before it. *See United States v. King*, 849 F.2d 485, 490 (11th Cir. 1988). If additional evidence is required to resolve the motion, the district court may hold an additional evidentiary hearing. *Id.*

The Court's inquiry into the necessity of pretrial detention is guided by 18 U.S.C. § 3142. Specifically, the Court examines whether there are any conditions or combination of conditions which reasonably will assure the appearance of the defendant as required, as well as the safety of any other person and the community. 18 U.S.C. § 3142(e). A finding that the defendant poses a flight risk or is a danger to the community is sufficient to detain the defendant pending trial.[1] *King*, 849 F.2d at 488. In making this determination, the Court considers the following factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g).

## III.  DISCUSSION

In considering the Revocation Motion, the Court must undertake an independent, *de novo* review of Magistrate Judge Ryu's Pretrial Release Order. *United States v.*

---

[1] The Government must prove that the Defendant is a flight risk by a preponderance of the evidence, or that she is a danger to the community by clear and convincing evidence. *See United States v. King*, 849 F.2d 485, 488–89 (11th Cir. 1988).

*Hurtado*, 779 F.2d 1467, 1481 (11th Cir. 1985). Ultimately, the Court must decide whether any condition or combination of conditions will reasonably assure: (1) the Defendant's appearance during the required proceedings; and (2) the safety of any other person and the community. *Id.* at 1479. Upon consideration, this Court finds that no condition or combination of conditions of pretrial release will reasonably assure the safety of the community or reasonably assure the Defendant's appearance during the required court proceedings.

Important to the Court's analysis is Defendant Salman's failure to rebut the statutory presumption that her continued release risks the safety of the community or her appearance at further court proceedings. Section 3142(e) of the Bail Reform Act creates several "rebuttable presumptions" that the Court must use in determining whether pretrial detention is necessary. *King*, 849 F.2d at 487. Germane to the instant proceeding is the statutory presumption created by § 3142, which provides as follows:

> Subject to rebuttal by the [defendant], it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the [defendant] as required and the safety of the community if the judicial officer finds that there is probable cause to believe that that the person committed . . . an offense under section 924(c), 956(a), or 2332b of this title.

18 U.S.C. § 3142(e)(3)(B) (hereinafter referred to as the "Statutory Presumption").

"Once the government makes a showing of probable cause that the defendant committed one of the enumerated acts[,] this triggers the presumption that the defendant either constitutes a danger to the community or poses a risk of flight from justice." *Hurtado*, 779 F.2d at 1479. Here, Count One of the Indictment charges Defendant Salman with violating 18 U.S.C. § 2339B(a)(1), which sets forth a potential term of life

imprisonment. (Doc. 1). "[T]o trigger section 3142(e)'s rebuttable presumption, the government need not make a showing of probable cause independent of the grand jury's indictment." *King*, 849 F.2d at 487–88. Thus, the Statutory Presumption is triggered in this action.

After the Statutory Presumption is triggered, "it becomes the task of the defendant to come forward with evidence to meet [her] burden of production—that is, evidence to suggest that [s]he is either not dangerous or not likely to flee if turned loose on bail." *Hurtado*, 779 F.2d at 1479. At a detention hearing, the defendant may satisfy this burden by testifying, presenting witnesses on her behalf, cross-examining any government witnesses, and presenting information by proffer or otherwise. *Id.*; 18 U.S.C. § 3142(f). However, even if the defendant presents sufficient evidence to rebut the Statutory Presumption, the effect of the presumption is not completely eliminated. *King*, 849 F.2d at 488. To this point, the "use of the word 'rebut' in this context is somewhat of a misnomer because the rebutted presumption is not erased. Instead it remains in the case as an evidentiary finding militating against release, to be weigh[ed] along with other evidence relevant to factors listed in section 3142(g)." *Id.* (quoting *United States v. Portes*, 786 F.2d 758, 764 (7th Cir. 1985)) (internal quotation marks omitted).

"[W]hen the question is whether the defendant has successfully rebutted the presumption created in subsection (e), the judicial officer is directed to the four-part catechism of subsection (g)." *Hurtado*, 779 F.2d at 1479. The Court must then consider any available information concerning:

> (1)     the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance,

firearm, explosive, or destructive device;

(2)    the weight of evidence against the person;

(3)    the history and characteristics of the person including—

      (A)    the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

      (B)    whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

(4)    the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g). In applying the foregoing factors, "a finding of either danger to the community *or* risk of flight will be sufficient to detain the defendant pending trial." *King*, 849 F.2d at 488 (quoting *Portes*, 786 F.2d at 765). Applying these legal principles, the Court will now address the evidence presented to Magistrate Judge Ryu.

## A.    Review of the Record Evidence

The undersigned has conducted an independent *de novo* review of the materials presented at the Detention Hearings held on February 1, 2017, and March 1, 2017, consisting of the following:

- Defendant Noor Salman's Motion for Conditional Release (M.J. Doc. 16);[2]

---

[2] Documents submitted to Magistrate Judge Ryu in the Northern District of

- Sworn declarations in support of Defendant's Motion for Conditional Release submitted by:

    i. Lauri Jaber (M.J. Doc. 16-1),
    ii. Heather Hayden (M.J. Doc. 16-2),
    iii. Shifa Itayem (M.J. Doc. 16-3),
    iv. Rana Omar (M.J. Doc. 16-4),
    v. Ekbal Salman (M.J. Doc. 16-5),
    vi. Abdallah Salman (M.J. Doc. 16-6),
    vii. Emtiyaz Adieh (M.J. Doc. 16-7),
    viii. Dr. Jacquelyn Campbell, PhD, RN, FAAN (M.J. Doc. 17);

- The expert report of Dr. John R. Chamberlain, M.D., appointed by the Court to conduct a mental health evaluation of the Defendant;

- The report prepared by the Pretrial Services Office, dated January 31, 2017, and the Addendum Report, dated February 28, 2017;[3]

- The audio recordings of the detention proceeds conducted on February 1, 2017 and March 1, 2017; and

- The supplemental declaration of Dr. Jacquelyn Campbell, submitted March 8, 2017. (Doc. 22, Ex. 9-2).

## B.     Summary of the February 1, 2017 Hearing

In conformance with the custom employed by the Magistrate Judge, the parties proffered to the Court the evidence upon which they intended to rely in seeking detention (in the case of the Government) and in seeking pretrial release (in the case of the Defendant). Counsel for the Government proffered to the Court that Defendant Salman's husband, Omar Mateen, had pledged his allegiance to Abu Bakr al-Baghdadi and the Islamic State prior to entering the Pulse nightclub on June 12, 2016. Omar Mateen made

---

California, Case No. 4:17-mj-70058-MAG, shall be cited herein is as "M.J. Doc."

[3] Dr. Chamberlain's report and the reports prepared by Pretrial Services were provided to the parties and were considered by the Court. However, the reports are confidential and are not part of the public record in the Northern District of California.

the following posts to Facebook: "America and Russia, stop bombing the Islamic State. I pledge my alliance to Abu Bakr al-Baghdadi. May Allah accept me." Omar Mateen further posted: "You kill innocent women and children by doing U.S. Air strikes. Now taste the Islamic State vengeance."

Government counsel further proffered that Defendant Salman was interviewed by the Federal Bureau of Investigation ("FBI") the day of the Pulse attack and that the Defendant made a number of incriminating admissions. The Government represents that Defendant Salman admitted Omar Mateen had been watching ISIL recruitment videos over a two-year period prior to the attack. Defendant Salman told the FBI that her husband watched these violent videos in the presence of their young son. Defendant Salman admitted she was aware of Mateen's motivation and his support of ISIL. Defendant Salman acknowledges in her motion for conditional release that she observed Mateen watching violent videos online from what appeared to be the Middle East. (M.J. Doc. 16, p. 4).

Defendant Salman further acknowledges in her motion for conditional release that, during the course of her marriage, she witnessed Mateen being questioned by the FBI on multiple occasions regarding statements he made expressing his support for terrorist organizations while he worked as a courthouse security guard. (*Id.*). Mateen initially denied to the FBI having made such statements, but retracted that claim upon learning from his father that the FBI possessed recordings of him making statements in support of terrorist organizations. (*Id.*). Defendant Salman also acknowledges in her motion to being present when the FBI sent Mateen a text message indicating their interest in speaking with him about a community member that had traveled to Syria. (*Id.*).

The Government further proffered that Defendant Salman told the FBI that between June 6, 2016, and June 11, 2016, she accompanied her husband on several trips characterized by the Government as "casing activity" or activity designed to scout potential terror attack locations. The first such trip occurred on June 6, 2016, when she drove with her husband to City Place in West Palm Beach, Florida. City Place is an entertainment complex consisting of retail stores, clubs, and restaurants. Defendant Salman told the FBI that as she and Mateen drove around he asked, "How bad would it be if a club got attacked?" Two days later, on June 8, 2016, Defendant Salman, Mateen, and their child drove from Fort Lucie, Florida, to the Disney Springs complex in Orlando, Florida. As they departed Disney Springs, Mateen asked Defendant Salman, "What would make people more upset an attack on downtown Disney or a club?" Lastly, Defendant Salman told the FBI that she and her husband drove by the Pulse nightclub during this timeframe.

Defendant Salman also admitted to the FBI that Omar Mateen engaged in unusual financial activities in the ten days prior to the Pulse shooting. On June 1, 2016, Mateen and Defendant Salman went to a bank where Mateen had an account and to which Defendant Salman had no access. Mateen added Defendant Salman's name to the account as payable-on-death, meaning that she would have access to the account when he died. Thereafter, Mateen spent approximately $25,000 over ten days, despite having an annual income of approximately $30,000. Mateen and Defendant Salman shopped for and purchased a $7,000 engagement ring for the Defendant. Mateen also gave the Defendant earrings, $500 in cash with which to purchase gifts and clothing,[4] and an

---

[4] Defendant Salman acknowledges in her motion for conditional release that

additional $1,000 in cash.[5] Mateen also purchased an AR-15 assault rifle and ammunition. Defendant Salman told the FBI she knew Mateen had purchased the AR-15, and admitted to being present when Mateen purchased ammunition in Walmart.[6]

The Government proffered that Defendant Salman admitted to the FBI that she knew Omar Mateen was planning a terrorist attack. Defendant Salman told the FBI that when Mateen left their home on June 11, 2016, she knew he was carrying the AR-15 and a backpack containing ammunition. Defendant Salman described Mateen as being pumped up and having said, "This is the one day." Defendant Salman told the FBI that she contrived a cover story whereby she advised Mateen to tell his mother that he was having dinner with a friend and if she asked where he was and that the Defendant would do the same. On June 11, as Mateen prepared to perpetrate the Pulse attack, Mateen's mother called Defendant Salman and asked where Mateen was. (M.J. Doc. 16, p. 6). Mateen's mother called because she had expected him to stop by that night for Ramadan, but he had failed to show up. (*Id.*).

When she was initially questioned by the FBI, Defendant Salman steadfastly claimed to have no knowledge of her husband's plan to commit an attack or his support for terrorist organizations. It was not until after prolonged questioning that Defendant Salman admitted knowing her husband had been watching ISIL recruitment videos, had

---

Mateen gave her the engagement ring, earrings, and $500. (M.J. Doc. 16, p. 4).

[5] The transfer of $1,000.00 in cash to Defendant Salman was not proffered to Magistrate Judge Ryu, and this fact is contained in the Government's Motion for an Order Revoking Bond. (Doc. 15, p. 14).

[6] The Defendant proffers in her motion for conditional release that she believed they were going to Walmart to get copies of keys made for their condominium, and that she was shopping for a toy for their son when Mateen purchased ammunition. (Doc. 16, p. 11). Defendant Salman further proffered that Mateen explained the purchase by saying he needed the ammunition to train for his job. (*Id.*).

been questioned by the FBI, had recently purchased an assault rifle, and had examined three possible attack locations. The Government's proffer concerning several of the admissions made to the FBI are confirmed by the Defendant in her motion seeking conditional release and in her own proffers to the Magistrate Judge.

The Defendant also proceeded by proffer and submitted the declarations identified above. The Defendant proffered, and the Government agreed, that the admissions to the FBI occurred at the end of an interview lasting approximately sixteen hours, that *Miranda* warnings were not given by the FBI, that the Defendant was accompanied as she moved about the FBI offices, and that the Defendant was not represented by counsel during the interview. The Defendant also proffered that she attended high school and required tutoring and that she was a special education student.[7] (M.J. Doc. 16-2). The record before Magistrate Judge Ryu further reflects that the Defendant also attended Heald College in Concord, California, and she obtained an Associate's Degree in Medical Administration in 2006.

The Defendant proffered that she is a battered spouse who spent most of her time at home and did not have any friends. Defendant Salman represented that her first marriage had been arranged, and she reported that her first husband threw an ashtray at the wall once and pulled her hair once. (Report by Dr. Chamberlain, p. 8). Defendant Salman further stated that Omar Mateen, her second husband, was violent and was physically and verbally abusive. (*Id.* at pp. 10–11). The Defendant submitted the declaration of Dr. Campbell, an expert on partner violence, who opined that the Defendant

---

[7] However, the Pretrial Services Office received Defendant's high school transcripts which did not indicate any type of special education classes or Individualized Education Program. (Report by Dr. Chamberlain, p. 5).

fell in the highest level of danger from an abusive intimate partner. (M.J. Doc. 17). However, Dr. Campbell did not opine whether the danger of abuse related to Defendant Salman's first husband or Omar Mateen, both of whom the Defendant proffered were violent towards her.

Dr. Chamberlain, who was appointed by the Magistrate Judge to evaluate the Defendant, concluded that Defendant Salman suffered from Post-Traumatic Stress Disorder ("PTSD"), and Unspecified Neurocognitive Disorder characterized by impairment in complex attention, learning and memory, and executive function. (*Id.* at p. 2). Dr. Chamberlain further reported to the Court that Defendant Salman completed the Minnesota Multiphasic Personality Inventory-2 (MMPI-2), which assesses psychiatric symptoms and personality characteristics and noted that Defendant Salman may have consciously distorted her test responses to create a particular impression, or she may be generally unsophisticated. (*Id.* at p. 14). Hence, Dr. Chamberlain advised that the resulting MMPI-2 clinical pattern should be interpreted with caution. (*Id.*). Dr. Chamberlain also administered the Shipley-2 assessment which is designed to evaluate intellectual functioning and to screen for impaired intellectual functioning. (*Id.* at pp. 15–16). The Defendant's Standard Score was 60, which indicates a high probability of intellectual impairment; however, the instrument does not definitively determine the presence of impairment and cannot indicate the cause or possible impact on functioning of any intellectual impairment. (*Id.*). Neither Dr. Chamberlain nor Dr. Campbell opined that the Defendant suffered from any cognitive or psychological impairment which prevented her from accurately and knowingly communicating with the FBI during her interview on

June 12, 2016. Additionally, neither expert quantified the level of Defendant Salman's cognitive functioning, such as her IQ.

The Defendant next proffered to the Court that on the evening of June 11, 2016, she went to dinner with her son and then went shopping to purchase a Father's Day card and gift for Omar Mateen. (M.J. Doc. 16, p. 5). Father's Day was June 18, 2016. The Defendant purchased a T-shirt inscribed with "World's Greatest Dad." That same evening, Defendant Salman called her family in California to inform them she was coming home for a visit at the end of the summer. The Defendant proffered that her uncle inquired whether Mateen would be accompanying her and her son, to which she replied in the affirmative. In her written submissions, the Defendant proffers that on June 11, 2016, Mateen came home from work as a security guard around 3:00 p.m. (*Id.*). The Defendant states Mateen informed her he had purchased tickets for their trip home and that he wanted to take their son out for a treat. (*Id.*). After going out as a family, Mateen informed Defendant Salman that he was going out for the evening, and that she could use the family car because he was using a car he had recently rented. (*Id.*). The Defendant writes that she asked Mateen to stay home to spend the evening together as a family, but Mateen insisted that he had to see a friend. (*Id.*). Accordingly, Defendant Salman proffered that she was unaware that Mateen had departed the family home armed with the AR-15 and the backpack of ammunition or that he was preparing to attack the Pulse nightclub.[8]

---

[8] The Defendant references in her motion for conditional release an interview she gave to The New York Times on November 1, 2016, titled "Orlando Gunman's Wife Breaks Silence: 'I Was Unaware.'" (M.J. Doc. 16, p. 5 n.25).

Defendant Salman proffered that while Mateen was at the Pulse nightclub perpetrating the attack, she was home sleeping with her three-year-old son. (*Id.* at p. 6). The Defendant was awoken by a phone call from Mateen's mother who advised her that Mateen had promised to stop by her home that evening for Ramadan but had failed to arrive. (*Id.*). Defendant Salman advised her mother-in-law that she was unaware of Mateen's whereabouts and offered to call him. (*Id.*). Unable to reach Mateen on his cellphone, Defendant Salman proffered that she texted him asking "Where are you?" to which he replied, "Do you see what's happening?" (*Id.*). She responded, "No," and Mateen replied "I love you, babe." (*Id.*).

The balance of the detention hearing conducted on February 1, 2017 focused on Defendant Salman's ties to the community—that is, her risk of flight. Defense counsel proffered that the Defendant's family has resided in the United States since the 1970s and are naturalized citizens. The Defendant's uncle, Abdallah Salman, offered to serve as a third-party custodian and volunteered to post his residence, having $550,000 in equity, as collateral to secure a bond. (M.J. Doc. 16-6). Similarly, the Defendant's mother, Ekbal Salman, offered to secure a bond with her residence, having $513,520 in equity. (M.J. Doc. 16-5). Furthermore, Mr. Abdallah Salman proffered that from the date the FBI first interviewed Defendant Salman until her return to California, he had communicated with the FBI twenty-four times to relay information concerning the Defendant's movements. (M.J. Doc. 16-6). Even after the Defendant moved in with her mother, the family continued to inform the FBI of Defendant Salman's movements. (M.J. Doc. 16, p. 7).

Finally, the Defendant offered declarations from family and friends who attested that they know Defendant Salman to be non-violent,[9] and to be a dedicated mother. (M.J. Docs. 16-1, 16-2, 16-3, 16-4). One declarant, Lauri Jaber, stated she had known the Defendant since they were three, and has known Defendant Salman to be nonviolent. (M.J. Doc. 16-1). While Ms. Jaber attests that she remains friends with Defendant Salman, she does not indicate when she last spoke with the Defendant. Heather Hayden, the Defendant's high school teacher, also attests to the Defendant's peaceful manner, but her last interaction with Defendant Salman was in 2004. (Doc. 16-2). Shifa Itayem attests to knowing the Defendant her entire life and confirmed her peaceful nature, but Ms. Itayem does not indicate when she last interacted with the Defendant. (M.J. Doc. 16-3). Finally, Rana Omar, the Defendant's cousin, provides the same assessment as Ms. Itayem, but Ms. Omar also omits any information concerning her last contact with the Defendant. (M.J. Doc. 16-4). Finally, the Defendant proffered that she lacks the financial assets necessary to flee the jurisdiction of this Court.

### C.    Summary of the March 1, 2017 Hearing

When the parties reconvened on March 1, 2017 to conclude the detention hearing, the Court questioned Mr. Abdallah Salman about the value of the family residence that would be used to secure an appearance bond. After confirming the equity in the family residence, Magistrate Judge Ryu discussed the responsibilities of a third party custodian and confirmed that Mr. Abdallah Salman was willing to undertake these responsibilities. The Court then questioned Mr. Abdallah Salman's wife to obtain her agreement to posting

---

[9] The Defendant also proffered that she is not religious and does not adhere to extremist political views.

the family residence as collateral for the appearance bond. At the Government's urging, Magistrate Judge Ryu inquired whether Mr. Abdallah Salman owned any assets overseas. Mr. Abdallah Salman acknowledged that he owns commercial property consisting of shops located in the West Bank, Palestine. He owns this property individually and paid approximately $200,000 for the property ten years ago. The current estimated value of the property located in Palestine is $500,000.

The Magistrate Judge next questioned the Defendant's mother, Ms. Ekbal Salman, about the equity in her home and confirmed its value. The Court confirmed that Ms. Ekbal Salman was willing to post her residence as security for the appearance bond. Upon further inquiry, the Court learned that Ms. Ekbal Salman owns an apartment in the West Bank, Palestine. Ms. Ekbal Salman paid $100,000 for the apartment and it remains unoccupied. Ms. Ekbal Salman uses the apartment when she visits family in Palestine. The Defendant last visited the apartment in Palestine in 2006. The Defendant did not proffer any information concerning compliance by The Palestinian National Authority with extradition requests in the event the Defendant were to flee to the West Bank, Palestine. Once the Court concluded its questioning of Mr. Abdallah Salman and Ms. Ekbal Salman, the parties presented argument, and Magistrate Judge Ryu issued her findings.

### D.    Findings by the District Court

This Court is not bound by the findings of the Magistrate Judge and has conducted an independent *de novo* review of the information presented by the parties. As Magistrate Judge Ryu correctly noted, the Defendant is charged with violating 18 U.S.C. §§ 2339B(a)(1) and (2), which offense triggers the Statutory Presumption, subject to rebuttal by the Defendant, that no condition or combination of conditions will reasonably

assure the appearance of the Defendant as required and the safety of the community. *See* 18 U.S.C. § 3142(e)(3)(B). Once the Statutory Presumption is triggered, "it becomes the task of the defendant to come forward with evidence to meet [her] burden of production—that is, evidence to suggest that [s]he is either not dangerous or not likely to flee if turned loose on bail." *Hurtado*, 779 F.2d at 1479. Even if the Defendant presents sufficient evidence to rebut the Statutory Presumption, however, the presumption is not erased. Instead, the Statutory Presumption remains in the case as an evidentiary finding militating against release to be weighed along with other evidence relevant to factors listed in § 3142(g). *King*, 849 F.2d at 488.

Turning to the four-part test announced in *Hurtado*, the Court agrees with Magistrate Judge Ryu that the nature of the charges in this case are very serious. This fact is conceded by the Defendant. (Doc. 22, p. 10). To be sure, terrorism is not a common violent crime, but a crime that "rips civilization's fabric." *United States v. Al-Arian*, 280 F. Supp. 2d 1345, 1351 (M.D. Fla. 2003). This truth is driven home by the tragic and catastrophic harm visited upon the innocent civilians who had the misfortune of being patrons at the Pulse nightclub on June 12, 2016.

The Court considers next the weight of the evidence against the Defendant, being mindful that the Government need not make a showing of probable cause independent of the grand jury's indictment. *See King*, 849 F.2d at 487–88. In this case, a grand jury returned a two-count Indictment against Defendant Salman. (Doc. 1). In addition to the grand jury's findings, the Government presented considerable information concerning the Defendant's alleged involvement in these crimes during the hearing conducted on

February 1, 2017.[10] It is worth noting that the Magistrate Judge announced her practice of proceeding via proffers at detention hearings, and the parties conformed their presentations to the Magistrate Judge's practice. This Court does not question the validity of that approach. In fact, the Court afforded the parties the opportunity to request an evidentiary hearing in Orlando, and the parties elected to proceed based on the record presented to Magistrate Judge Ryu.

On the issue of the weight of the evidence against the Defendant, the Government proffered that Defendant Salman made a number of incriminating statements to the FBI during an extensive interview immediately following the attack. The Defendant challenges the reliability of these admissions, arguing that they occurred at the end of a long interview during which the Defendant was not represented by counsel. However, several of the Defendant's admissions are corroborated by the Defendant's own proffer set forth either at the February 1 hearing or contained in her motion for conditional release.

For example, the Defendant told the FBI that she observed her husband watching ISIL recruitment videos over a two-year period, and she admitted that Mateen watched these videos in the presence of their young child. This admission is corroborated by the Defendant's proffer that she observed Mateen watching violent videos online from what appeared to be the Middle East. Defendant Salman also told the FBI that she was aware

---

[10] Magistrate Judge Ryu properly remarked that a detention hearing must not and should not become a trial on the merits. The findings made by this Court, therefore, are for the purpose of assessing whether conditions of release are appropriate based upon the proffered evidence. A finding by this Court that no condition or combination of conditions will assure the appearance of the Defendant as required or the safety of the community does not constitute a judgment on the merits of the Government's allegations. At trial, the Government must carry its burden of proving these offenses beyond a reasonable doubt—a burden not present in the instant proceeding.

of her husband's support for ISIL. This admission is again corroborated by the Defendant's proffer to the Magistrate Judge, and the Defendant admits in her motion that she knew her husband was being interviewed by the FBI in connection with statements he had made showing his support for terrorist organizations. In fact, the Defendant admits in her motion that she was aware her husband had denied making these statements until he learned from his father that the FBI had recordings of Mateen's extremist views. However, when interviewed by the FBI, the Defendant denied knowledge of her husband's extremist views until well into the sixteen-hour interview. The Defendant now readily concedes knowing that Mateen had a history of watching ISIL recruitment videos and making statements in support of terrorist organizations. The persistent denial of these facts when questioned by the FBI gives this Court grave concern over the Defendant's amenability to conditions of pretrial release.

According to the Government, Defendant Salman also admitted to traveling with her husband to three locations in order to scout possible targets for a terror attack. The trips to these locations (City Place, Disney Springs, and Pulse) occurred in the days immediately leading up to the Pulse attack. The Defendant admits having been present on these trips with her husband, but she claims that she was merely a bystander. However, it is undisputed by the parties that these trips, characterized by the Government as "casing activities," did not occur in a vacuum. That is, prior to making the first trip to City Place on June 6, 2016, Omar Mateen had already taken the Defendant to his bank to have her registered as a payable-on-death beneficiary. Five days later, the Defendant and Mateen drove to City Place and while driving around the venue, the Defendant confirmed that Mateen asked her, "How bad would it be if a club got attacked?" This

statement was made to Defendant Salman by a person she knows to support terrorist organizations, who she had witnessed watching violent ISIL recruiting videos in her home, and who she portrays as violent. Two days later, the Defendant traveled with Mateen to Disney Springs, several hours from their home, and Mateen again asked the Defendant, "What would make people more upset an attack on downtown Disney or a club?" During the days leading up to the attack, the Defendant accompanied Mateen as they drove by the Pulse nightclub. And after knowing that Mateen had just completed his attack on the Pulse nightclub, Defendant Salman—according to her own attorneys—denied all knowledge of these facts until well into a sixteen-hour interview with the FBI.

Moreover, Defendant Salman was present when Mateen spent money well beyond their means, including the purchase of a $7,000 engagement ring and earrings for the Defendant, and admits receiving cash from Mateen in the days leading up to the attack. Mateen earned approximately $30,000 annually, and yet he spent approximately $25,000—much of this on credit—prior to his death. While the Defendant argues that Mateen had showed her a letter indicating a pending job offer, these expenditures are highly suspect. The Defendant further admitted to the FBI that Mateen purchased an AR-15 assault rifle prior to the attack. This admission is corroborated by the fact that Mateen used the AR-15 to kill and injure dozens of civilians at the Pulse nightclub. The Defendant further admitted to the FBI that she observed him leave their residence on June 11, 2016 armed with the AR-15 and carrying a backpack containing ammunition. The Defendant told the FBI that Mateen was "pumped up" and that he commented, "This is the one day" prior to leaving that evening.

Defendant Salman denies having any knowledge that her husband was planning the attack, essentially ignoring or contradicting a confession she made to the FBI immediately following the attack. The Defendant proffered that Mateen left their residence the evening of June 11, 2016 in a rented vehicle (which apparently raised no concern with Defendant Salman) to visit an unidentified friend. On this point, the parties have directly conflicting views of the evidence. On the one hand, the Defendant proffered at her detention hearing that Mateen left the home claiming to be visiting a friend. On the other hand, the Government proffered that the Defendant admitted to actually seeing Mateen in possession of the AR-15 and the ammunition as he departed. In view of the totality of the admissions made by the Defendant to the FBI, the Court finds the proffered admission of having seen the AR-15 and the backpack containing ammunition more credible than the proffer presented by the Defendant at the detention hearing that Mateen left the family residence to visit a friend.

Finally, the Government proffered that Defendant Salman admitted to the FBI—armed with knowledge of her husband's professed support for terrorist organizations, his pattern of viewing ISIL videos, his recent purchase of the AR-15, and his statements concerning the impact of attacking Disney versus a club—that she crafted a cover story to be used by both herself and Mateen in the event Mateen's mother inquired about his whereabouts the evening of the attack. The need for a cover story is explained by the information proffered by the Defendant. First, Defendant Salman knew that Mateen's father had informed Mateen that the FBI had recorded conversations where Mateen expressed support for terrorist organizations.[11] Second, Mateen's mother expected him

---

[11] This is not to suggest that Mateen's father endorsed his son's support for terrorist

to come over to the family residence on June 11 to observe Ramadan. Therefore, a cover story was necessary to prevent suspicion on the part of Mateen's parents due to his absence from the Ramadan observance. As it turned out, Defendant Salman proffered that Mateen's mother called her the evening of the attack concerned that Mateen had not come over to observe Ramadan as promised.

The Defendant posits that her actions on the evening of June 11, 2016, are inconsistent with guilty knowledge of a pending terror attack. The Defendant points to the fact that she took her son to dinner, purchased a Father's Day card and gift, and called family to share that she and Mateen would be visiting at the end of the summer. Indeed, a jury may agree that these facts are inconsistent with the guilty knowledge portrayed by the Government. However, a reasonable jury could likewise conclude that the purchase of a Father's Day card and gift a week prior to Father's Day and the call home to discuss family travel on the evening of the Pulse attack are conscious steps taken to fabricate plausible deniability following the completion of the attack. Defendant's admission to having created a cover story lends credibility to the latter construction of these events.

Similarly, the Defendant cites her text message exchange with Mateen during the Pulse attack as evidence of her innocence. Again, a jury may agree with that scenario, or a jury may read the text messages quite differently. The first text message is from Defendant Salman and asks, "Where are you?" This either shows Defendant Salman was unaware of her husband's whereabouts because he simply told her he was spending the evening with a friend, or the question is literally "Where are you?" in that three separate

---

organizations. To the contrary, the Government suggests the cover story was necessary precisely because Mateen's family did not support his views.

attack locations had been scouted. Mateen replies, "Do you see what's happening?" to which Defendant Salman replied "No." Again, a jury may view this as the Defendant suggests; however, a jury may question why the response was not "What are you talking about?" as opposed to merely "No." One with foreknowledge of the impending attack need not inquire of the meaning of Mateen's reply, or so one could argue. Mateen's final words to his wife are, "I love you, babe." The Defendant does not suggest that she replied to this message questioning the meaning of the comment "Do you see what's happening?"

This Court finds that the Defendant's admissions to the FBI, several of which are corroborated by the Defendant in her proffer at the February 1, 2017 detention hearing, constitute substantial and credible evidence that Defendant Salman aided and abetted Mateen in the attempted provision and provision of material support to a foreign terrorist organization. To the extent the Magistrate Judge found the strength of the evidence to be "debatable," the undersigned disagrees. Furthermore, this Court is unpersuaded by the declarations of Defendant Salman's friends and family who attest to her peaceful character, not because the Court questions the honesty of the declarants, but rather because the witnesses fail to provide sufficient context from which this Court can assess when the witnesses last had meaningful contact with the Defendant. Additionally, the opinion of friends and family that Defendant Salman is a peaceful person who will not present a danger to the community or flee is insufficient to rebut the Statutory Presumption. Even if the evidence proffered by the Defendant were adequate to rebut the Statutory Presumption, this Court would still conclude that no condition or combination of conditions may be fashioned which would assure the safety of the community.

The Court acknowledges that Magistrate Judge Ryu asked the Government to identify a specific danger to the community posed by Defendant Salman and that the Government was unable to identify a present threat. However, it is the finding of this Court that the Magistrate Judge misapprehends the meaning of danger to the community by asking the Government to identify a specific future threat. Defendant Salman is charged with aiding and abetting a horrific terror attack. These charges are, as previously discussed, supported by numerous admissions made by the Defendant, several of which are corroborated by her own proffers. The existence of the Defendant's past involvement in a terrorist attack, even recognizing she did not pull the trigger, poses too great of a danger to the community to warrant pretrial release.[12] While the Magistrate Judge found Defendant Salman does not have any ties to the Islamic State and has not personally exhibit extremist views, the Magistrate Judge unduly minimizes the Defendant's admitted knowledge of Mateen's own extremist and violent views, his preparation for the attack, and the Defendant's admission that Mateen departed the family home on June 11, 2016, armed with an assault weapon and ammunition. This latter admission—having observed Mateen in possession of an assault weapon and ammunition—is not even mentioned by the Magistrate Judge in her findings. It is not an element of either crime charged in the Indictment that Defendant Salman share her husband's extremist views. The Defendant is only charged with aiding and abetting Mateen. It is of little solace in assessing the danger to the community that one who allegedly aids and abets a terrorist attack does not

---

[12] There are certainly instances where a defendant presents a specific and identifiable future risk of danger to an individual, such as a witness, or the community. However, in the vast majority of cases a defendant is detained pending trial due to his or her past actions which are predictive of future risk. This is such a case.

personally support the objectives voiced by ISIL and similar terrorist organizations, particularly where, as here, the attack proceeded from mere talk to devastating action.

Finally, on the issue of the weight of the evidence, the Magistrate Judge in rendering her findings questioned the weight to be given to the Defendant's admissions, remarking that the Government did not offer into evidence the video or audio recordings (if any exist) of the alleged admissions. The Magistrate Judge further observed that the admissions were made toward the end of a sixteen-hour interview. However, the Magistrate Judge instructed the parties to proceed by proffer—while not precluding live testimony—but then questions the weight of the Government's evidence because it was presented via proffer, which is her preference. In contrast, the Defendant likewise proceeded largely by proffer, including the submission of declarations, yet the Magistrate Judge accepted the Defendant's proffered evidence. This Court disagrees with Magistrate Judge Ryu's criticism of the manner in which the Government presented its evidence or the weight to be attributed to that evidence.

Additionally, the Magistrate Judge, in fashioning conditions of pretrial release, observed that Defendant Salman is a victim of domestic violence and suffers from some cognitive deficits which may impact her abstract thinking, making the admissions vulnerable to constitutional attack or which may cause a jury to question whether the Defendant's statements to the FBI are actually admissions. This Court finds that the Magistrate Judge erred in reaching these conclusions. First, it is noteworthy that the Defendant did not at any time either prior to the detention hearing or during the detention hearing contend that she was incompetent to proceed. In fact, the Defendant did not request the psychiatric evaluation ordered by the Magistrate Judge; rather, Magistrate

Judge Ryu ordered the evaluation at the conclusion of the February 1, 2017 detention hearing to assess treatment options which might benefit the Defendant in the event the Court ordered her conditional release.

Moreover, Dr. Chamberlain conducted the psychiatric evaluation ordered by the Magistrate Judge to assess the Defendant's treatment needs. Dr. Chamberlain did not evaluate the Defendant to assess whether the admissions she made to the FBI were knowing, voluntary, or intelligent. While Dr. Chamberlain generally found that Defendant Salman suffered from PTSD and Unspecified Neurocognitive Disorder characterized by impairment in complex attention, learning and memory, and executive function, he did not quantify these findings particularly as they may relate to the Defendant's ability to provide knowing, informed, and voluntary admissions to the FBI. More importantly, Dr. Chamberlain questioned whether the Defendant intentionally distorted her test results on the MMPI-2, and he noted that the Shipley-2 test does not definitively determine the presence of impairment or the possible impact on functioning of any intellectual impairment. Notwithstanding these reservations and limitations, the Magistrate Judge questions the admissibility and weight to be given to the Defendant's admissions based upon Dr. Chamberlain's report, despite the fact that these admissions were largely corroborated at the detention hearing and in Defendant's motion. The Magistrate Judge's findings simply go too far in assuming, without justification, that Defendant Salman lacked the capacity to communicate her alleged admissions to the FBI. Assuming a motion to suppress the Defendant's admissions is to be filed by the Defense, this Court will

ultimately decide whether the admissions were obtained in violation of or compliance with the United States Constitution.[13]

The Court now turns to the issue of whether conditions of pretrial release can be fashioned to assure the Defendant's appearance at future proceedings. As previously discussed, the Statutory Presumption that no such condition or combination of conditions may be fashioned applies to this case. The Defendant presented evidence that her uncle, Mr. Abdallah Salman, and mother, Ms. Ekbal Salman, own property with considerable equity and are willing to post the property to secure an appearance bond. Similarly, Mr. Abdallah Salman has demonstrated his willingness to serve as a third-party custodian, and he has consistently advised the FBI of the Defendant's movements. However, Mr. Abdallah Salman and Ms. Ekbal Salman own property, including a residential apartment, located in the West Bank, Palestine, and the Defendant has visited the apartment previously. For reasons unknown, the Pretrial Services Office failed to discover the existence of these properties, which only became known to the Government and to the Court after the Government asked the Magistrate Judge to inquire about such holdings. No evidence was presented or proffered by the Defendant concerning whether the Palestinian National Authority—which governs the West Bank—would comply with extradition requests from the United States should Defendant Salman flee to take up residence in Palestine.

---

[13] As a final note on this point, the defense in this case is not that Defendant Salman was an abused spouse who acted under duress when she allegedly aided and abetted Mateen. Rather, the defense presented by the Defendant at the detention hearing is that Defendant Salman was unaware of her husband's plan to launch a terrorist attack. As a result, there is no apparent relevance between the Defendant's contention that she was abused by Mateen and her admissions to the FBI, and the Defendant has offered no expert testimony or evidence for the Court's consideration.

The evidence proffered by the parties includes the acknowledgment that Defendant Salman persisted in denying any knowledge concerning Mateen's support for terrorist organizations or his activities and plans leading up to the attack when interviewed by the FBI. Toward the end of a lengthy interview, Defendant Salman made a number of admissions. This alleged lack of candor with the FBI resulted in the grand jury indicting the Defendant for obstruction of justice. The fact that the Defendant is alleged to have willingly misled the FBI within the hours immediately following the Pulse attack—when the FBI could not have known for sure whether Mateen acted alone—leads this Court to conclude that the Defendant presents an unacceptable risk of flight if released. While the Defendant, acting through her uncle, communicated consistently with the FBI regarding her movements, these communications occurred while the Defendant was already a suspect in the crimes with which she is now charged. Finally, the Defendant faces a potential life sentence if she is convicted on Count One of the Indictment. Accordingly, the Court finds that no condition or combination of conditions will assure the Defendant's presence at future proceedings.

## IV.    CONCLUSION

Accordingly, it is hereby **ORDERED AND ADJUDGED** as follows:

1. The Government's Motion for Revocation of Release Order (Doc. 15) is **GRANTED**.

2. U.S. Magistrate Judge Ryu's Order Setting Conditions of Release is **REVOKED**.

3. Defendant Noor Zahi Salman shall be **DETAINED** pending trial.

4. In accordance with 18 U.S.C. § 3142(i), Defendant Noor Zahi Salman shall

be committed to the custody of the Attorney General for confinement in a corrections facility separate, to the extent practicable, from persons waiting or serving sentences or being held in custody pending appeal. Once in custody, Defendant shall be afforded reasonable opportunity for private consultation with her counsel. On order of the Court, or request by the Government, the corrections facility in which Defendant is confined shall deliver Defendant to a U.S. marshal for the purpose of an appearance in connection with a court proceeding.

**DONE AND ORDERED** in Chambers in Orlando, Florida, on March 10, 2017.

_____
PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies:
Counsel of Record